v. Mid-Continent Steel & Wire, 2022-20241, Mr. Masek. Good morning, Your Honor. This is Annual Review 1 of the Taiwan Order. We can continue with what we were talking about when you were talking about Annual Review 4 and the AFA rate for the non-selected respondents, which we think is an AR-4 directly contrary to law, an AR-1 directly contrary to law, and law here is based on your court's decision in BESPAC in 2013, and also on the Statement of Administrative Action, which talks about if it results in an average that would not be reasonably reflective of potential anti-dumping margins for non-investigated exporters and producers, and commerce may use other reasonable methods. That's the SAA. I was here 11 years ago in BESPAC, and in BESPAC we had the same situation. We had a zero rate, and we had an AFA rate, and the court very, very clearly, without having us put on additional evidence, said, and I'll quote, assigning a non-mandatory separate rate respondent a margin equal to over 120% of the only fully investigated respondent whose calculated rate was zero with no other information is unjustifiably high and may amount to being punitive, which is not permitted by the statute. That's BESPAC. There are multiple CIT cases afterwards. There's Gallant Ocean saying a non-cooperative respondent can't get a punitive rate. So this is commercial reality for respondents who are cooperating. It cannot use this expected method. It's not expected. It has to be reasonable, and it's based on BESPAC, which I think is, you know, controlling precedent and excellent analysis, which is still the law. But that's the part of it you were talking about before. I want to get into Unicatch, and Unicatch did receive an adverse facts available rate. Not only did it receive an adverse facts available rate, it had total AFA. They ignored and all of the evidence that we put on the record. And it wasn't just total AFA. It was total AFA at the most punitive rate, which was 78.17%. And what I'd like to do is talk about what commerce should be doing when it has a respondent who has made a mistake. And you have a respondent who made a mistake, whether it's facts available, adverse facts available, or even total adverse facts available. It's a weighing process. And it's a weighing process based on this Court's decision in BMW and D'Acera. And BMW, I believe, is a critical case here. In BMW, you had a respondent who made a mistake, who missed a deadline, adverse facts available. But it came up to this Court, and the Court said the purpose of the law, and I'll quote, is not to impose punitive, aberrational, or uncooperated margins. The AFA rate is intended to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance. While a higher adverse margin creates a stronger deterrence, commerce must not overreach reality in seeking to maximize deterrence. So that's BMW. We believe that's controlling law. And when we apply BMW and D'Acera and the paper Frederick decision to the facts and circumstances, the totality of the evidence, to our client Unicatch, we believe that Unicatch, on the scale of wrongdoing, Unicatch is very, very low. On the scale of rates, it was the death penalty. So when you have low culpability, when you have no willful action in our part, clearly not willful. We messed up. We did not complete a course reconciliation in the manner that commerce was expecting us to do that. There was no question. There was no question that they asked us again, but very cryptically. Then they asked us again cryptically. But when they were asking us these cryptic questions, these one-line questions, it wasn't just asking us on this particular point. They were throwing bombs at us. 20, 30, 40, 50 questions. This was one of many questions. And we didn't give them what they wanted. Significantly, when they issued their preliminary determination, they accepted our data. And in the last supplemental questionnaire that they sent us, they didn't ask this question again. So they accepted our data. They didn't ask the question again in their last supplemental. Petitioners, when they were arguing for AFA before the preliminary, they didn't bring this up. So this was one of many points, the course reconciliation. Were we perfect? No. Another important point is that after our case, when you look at other cases and when you look at what Commerce did, and this is the appendix at 6495, in other cases afterwards, Commerce realized for a very complex course reconciliation, you should have a chart with a beginning and an ending and everything that's in between. And they've used that in other cases. And the other thing that Commerce has done in other cases, what the courts have done, and when the courts have said total AFA is acceptable, the courts have said that Commerce has given this chart. And the company wasn't able to fill out the charts correctly. So we didn't get the chart. We didn't know that this was going to be the purpose, you know, the linchpin of Commerce's decision. And we got sandbagged. Again, we're not perfect, but we got sandbagged. Again, we're at the bottom level of the wrongdoers and the top level of the AFA rate. And that gets me into the AFA rate, which is kind of what you were talking about in the first argument. It's a 78.17 percent rate. Now, where does this rate come from? This rate comes from the investigation. It's a rate that Petitioner puts on the record based on data in 2013. In annual review one, what Commerce did is they corroborate, or they said they were corroborating this rate. Now, how did they corroborate the rate in annual review one when it went back on remand? What they did, they look at the data on the record from the other respondent, and they said the 78.17 rate is less than the rate for certain sales of the other respondent in AR1. But look at the record. Look what they said was corroborated. There were two sales that they said were corroborating. The two sales were at rates of 189 percent. So they took these two sales out of sales in Pro Team's database, because they used that for corroboration, of 12,541 sales, .016 percent. The value of those two sales was $974 out of $35 million. The quantity was 2,000 kilograms out of 22 million kilograms. The next highest rate is 19.83 percent. So they're taking this 78.17 rate. They're saying it's corroborating because there's two sales here, but it doesn't come close to the meaning of corroboration. This is an, and I'm using the language of the Court of International Trade in many cases, they've overreached reality. It's a uniquely extreme overreach. It's a minuscule percentage, an extreme outlier. So what we're saying is the 78.7 rate just is not valid. It's not valid in this case, and it wouldn't be valid in AR4, but it's not valid in this case. It's from outer space. It's from 2013 corroborated by two absolutely outlying sales from the database. And so the rates from outer space, or what we've done is we didn't complete an analysis. And when you look at the analysis, again, I'm saying, will we perfect? No. But the analysis, our analysis was that we put on the record all of the underlying data to complete this chart. We put on our product-specific costs. We conformed our product-specific costs to a financial statement. Then we put in our costs that were on, in our database, on the material costs, the labor costs, energy costs, and we showed exactly what the costs were, but we didn't finish. We didn't put on 10 additional lines in our reconciliation.   As I said before, we don't perform aninenation. What do you make, if anything, out of the fact that the commerce third supplemental request didn't mention this deficiency? I make a lot out of it. Look, I think what happened was you had first supplemental request, they mentioned it. The second, they mentioned it in a cryptic manner. The third supplemental, they didn't mention it at all. And then right after the third supplemental, you have the preliminary determination, where they calculate it based on our rate. I think, and, you know, I shouldn't, I guess, but I'm going to speculate before the court that the analysts who were handling this case were perfectly satisfied. They understood the data that was on the record. And somebody somewhere, and I know they're allowed to change their minds, it's just a preliminary, but in this case, it's a preliminary where you accept something, there are no additional facts, and in the final, you're flipping from a calculated rate where they're basing our margin on all our data, all our good data, flipping and saying none of our data is any good. So somebody someplace had a change of heart. I don't know who, but you shouldn't do that. You don't have a death, you don't give somebody the death penalty after you originally say it's okay, and then you don't have any, you don't find any additional facts to say it's bad. It wasn't complete originally, but somebody in Commerce, the people who are looking at the data, thought it was enough. And they thought it was enough that they accepted it. And then Commerce didn't follow up. Commerce could have very, look, what Commerce could have done in this case, and they could have sent, they could have given us a chart like they did in all the other annual reviews, which they've used for AFA purposes when the court has affirmed AFA. They said you didn't look at this chart. They didn't give us the chart, which would have been enough. They could have said in their next, in the supplemental where they didn't ask the question, because the supplemental where they didn't ask the question, there was one question, they could have made it two questions, and you bet, if we would have seen two questions, we would have got it. Or they could have given us a call. They could have done all these things, but it appeared that this wasn't an issue. Again, when we were answering the supplementals where we made, where we didn't give them exactly what they wanted, it wasn't just this one question. It was hundreds of questions in the first, in the second, and Petitioner was throwing all kinds of allegations at us that we were responding. It's, again, we're dodging bullets in the fog of war. We missed something. Well, I don't think it's from the government. Thank you, Your Honor. Justice Bransford, you can say what you want to say. Ms. Day. May it please the court. We respectfully request that this court affirm the trial court's judgment. I'd like to start by pointing out this court's decision in Maverick Tube from a few years ago, because that case is exactly on point. In Maverick Tube, the court explicitly stated that the respondent effectively concedes that it possessed information necessary to Commerce's investigation, that Commerce requested that information, and that the respondent did not provide that information. Such behavior cannot be considered maximum effort to provide Commerce with full and complete answers. And that's exactly what happened here. There's one distinction, and that is that in the third supplemental questionnaire, Commerce didn't ask or indicate that the reconciliation information was inadequate. What are we to make of that? It seems kind of odd on the face of it. Wait, wait, let me finish. On the face of it, there was this complaint about the reconciliation data, responses to it, and then in the third request, there's no mention that Commerce found it unsatisfactory. So there are a few reasons why Commerce not mentioning it in that third supplemental questionnaire shouldn't be dispositive over whether AFA was warranted. First of all, under the statute, Commerce wasn't required to give them a fourth bite at the apple. They already had three chances to respond to Commerce's questions and failed to completely do so. Moreover, I can't speculate as to why Commerce didn't ask them about it in this third supplemental questionnaire, but my supposition is that at that point, they didn't have time to fully analyze and interpret that data, which is again why they actually used a calculated rate in the preliminary results. And it was only when Commerce tried to do Unicatch's job for it and actually tried to conduct this reconciliation itself, and that is detailed at pages 6309 to 6310 of the appendix, Commerce, using the roadmap that Unicatch gave it, tried to finish this reconciliation, tried to fill the gap in the record, went above and beyond, and still couldn't do it. So given that, it's clear that there was information missing from the record. It's clear that Commerce gave Unicatch three separate chances to look at it, and it's clear that regardless of intention or motivation, as Nippon still says, Commerce can still apply AFA if it reasonably expected more, and if it's thought that Unicatch was not acting to the maximum extent of its ability. I'd like to move to corroboration. I think that Mr. Marshak has a little bit of a, there's a little bit of a mischaracterization of what corroboration requires here. Corroboration only requires that Commerce satisfy itself using resources that are practicably at its disposal, that this rate has some probative value. It does not need to show commercial reality, and that's a really important distinction here. Mr. Marshak mentioned a few times commercial reality, commercial reality, but the statute was recently amended to explicitly not require Commerce to show that the AFA rate reflects a non-cooperating respondent's commercial reality. All it needs to do is corroborate that information to make sure that that information is probative, has some relevance, and it did that here. It used the transaction-specific method, which has been countenanced by this Court in multiple places, most importantly and recently in the Papier-Fabrique case, and again, in Papier-Fabrique, this Court held that it doesn't matter if the margins are very high or if it only represents a small amount of sales, that in and of itself is not enough to show that those margins are aberrational, and that's exactly what happened here. Unicatch did not point out there's any reason for these sales to be considered to be aberrational in terms of them having strange terms or being made outside of the ordinary course of business. All they can say is that it's too high and it's too few, but this Court has said in Papier-Fabrique that that is not the standard for determining whether something is aberrant. And finally, it's important to note that not only did Commerce use this transaction-specific method, which would have been enough on its own, it also double-corroborated using the component method. So certainly, if one method wasn't enough, using two very different methods that both showed corroboration should be. And as long as this rate is properly corroborated, Commerce has acted within its discretion and the rate is not considered to be punitive. I'll just conclude by talking a little bit about the application of the all-others rate. I know we just spent several minutes talking about it with regard to the fourth review period, but here we'll talk about it a little bit in this context. One is that Mr. Marshak and Unicatch's reliance on BESPAC is limited, despite what they might have the Court think, because in BESPAC, the Court explicitly said that AFA rates can be considered in calculating the all-others rate. And in BESPAC, importantly, Commerce departed from the expected method. Here, they exactly adhered to the expected method. They took PT's 0% rate, and they took Bonitz's and Unicatch's AFA rates, and they weight-averaged those together to come up with a 35% AFA rate. This is exactly what Congress contemplated when it says, in the absence of non-zero calculated rates, the expected thing for Commerce to do is to weight-average AFA, zero, and de minimis rates. That's exactly what happened here, and Unicatch has not, sorry, not Unicatch, but Horliang and Romp have not demonstrated that this rate would not be reasonably reflected of their dumping behavior. I'm happy to answer any other questions the Court might have. Otherwise, I'll cede the rest of my time to Mr. Gordon. Thank you. Okay, Mr. Gordon. If you need more than four minutes, you can use thumb press. Thank you, sir. Thank you, Your Honors. I'd like to pick up on an area of inquiry from you, Judge Dyke. You asked what to make of the fact that the third supplemental response didn't, again, ask about the cost-reconciliation errors. I think it's important to take a little half-step back.  in his opening, talking about how Commerce was asking so many questions, questions about this, questions about this. I think they were coming like bombs. I heard that phrase. What does that reflect? That reflects the problem. That reflects the fact that the responses Commerce was dealing with had a lot of problems, highly flawed. If you look at our case brief, we briefed on over half a dozen different bases for supporting a determination of adverse facts available. So it's no surprise that Commerce wouldn't necessarily have all the time necessary to get into the cost-reconciliation. Again, they had asked for it three times. How many times do they have to ask for it? One bite of the apple is all they need to give a respondent. And yet they had done it three times. And, in fact, as Ms. Bay pointed out, even after the preliminary results, they tried to do the respondent's job for them. And it was when they tried to complete the cost-reconciliation that they started really unpacking the problems there and seeing just how severe the problems in the cost-reconciliation exercise were. If you read their issues and decision memorandum, it highlights that very clearly. So, you know, and I think it's also important to note that what we're talking about here, the cost-reconciliation, it's not as if the respondent merely misreported, you know, the distance for their foreign and inland freight. The cost-reconciliation goes to the heart of the anti-dumping analysis. If you can't validate a respondent's reported costs, you can't trust their data. It's unreliable. And they have very experienced counsel who worked with them throughout the entire process. They know what they're doing. And, you know, being asked three times for this, and we briefed on it, and after the briefing, Commerce started trying to do the respondent's job for them, only to find, wow, there are a lot of problems here. It goes to the heart of the analysis. I'm not sure it makes any difference. But, actually, Commerce didn't focus three times on the reconciliation issue, just twice, right? Well, they asked for it in the original questionnaire. Then they asked for it in the first supplemental questionnaire. Then they asked for it in the second supplemental questionnaire. That's three times. They indicated dissatisfaction on two occasions. But they requested a complete cost-reconciliation three times. And then they highlighted the myriad deficiencies twice. If that's not enough to put them on notice that they need to clean up their act and get it on the record correctly, I don't know what is. So my point here is that, you know, this goes to the heart of the analysis. I guess the problem is that they thought, perhaps thought that they had cleaned up their act because the third supplemental request didn't need more or request any further information about reconciliation. Well, as Mr. Marshak has admitted here in open court, they messed up. And it doesn't, you know, their statute doesn't require culpability. It doesn't require mens rea. It requires, you know, a demonstration which Commerce has successfully made that the respondent failed to act to the best of its ability to cooperate with requests for necessary information. That's exactly what happened here. He says they made a small mistake in the death penalty. That's not the case, Your Honor. That's hyperbolic. It's not a small mistake because when you think about, as I said, the cost of reconciliation goes to the heart of the reliability of a respondent's data. And the death penalty, well, as we've talked about here, you know, the AFA rate was absolutely well known. It came from the petition. Everyone knows that's what it does. It's not like it's a new idea. So they knew it was coming. But there's no contention here that they did it with an intentional failure to cooperate, right? It doesn't need to be intentional. No, I understand. But that is a relevant consideration, isn't it, in determining whether to apply AFA? A failure to cooperate by failing to act to the best of their ability with requests for necessary information. That's what the statute requires. I've seen a lot of things in my day, Your Honor. I can't speculate as to what, you know, Respondent's Counsel was or wasn't doing. I mean, I just don't know. And that's why the statute doesn't require a showing of intent. Okay. But the cases say that's a factor to be considered in determining whether to apply an AFA rate, right? Yes. But here, because it goes to the heart of the analysis, as I said, it's not a small flaw. It's not like Commerce decided to reject their data because they failed to report a movement expense. They can't rely on the data because they couldn't complete the cost reconciliation. It's like a corporation going through an audit and having the auditors have to give a qualified opinion. You can't trust the data. What would the market do to a company like that? So with that, Your Honor, we would respectfully urge the Court to affirm. This is, again, in our opinion, a straightforward matter. And we request that the Court would affirm the trade court. Thank you. Thank you. We appreciate all the arguments. The case is submitted. I need a rebuttal. I beg your pardon. Mr. Nasher, please make a rebuttal. Thank you. Thank you, Your Honor. I'll be short because I don't have much time. The first thing is, you know, counsel is talking. I don't know what else Commerce would have done or should have done. Very, very simple. Look at pages 6489 through 6495 of the appendix. After this case, what Commerce did is they gave the chart. They gave the template. And they gave the template in other cases. Where this Court has affirmed total IFA, it's because that respondents have not followed the template. Next was our mistake small. We're not saying that the course reconciliation isn't important. It's very important. But when you look at the degree of culpability, you determine whether it's willful, whether we're trying to do something. And I'll look at paper fabric, which counsel for the government talks about. And there the Court sustained Commerce's reliance based on what the CAFC had. Extraordinarily factual situation posed by this case. Respondents failed to cooperate. Consents of misconduct so serious that it undermines the very integrity of the proceeding. Based on this extraordinary record, Commerce was within its discretion selecting a rate with a substantial built-in increase. Extraordinary record undermines the very integrity. We tried. There is no question. You know, we tried our best. We didn't put in the end of the chart. The data is there. And Commerce, they accepted the data for the preliminary. Now, they very easily, and they've done this in the past. And in this case, for another respondent, they said total AFA in the preliminary. And that had been reversed. That was reversed by the CIT. For us, they accepted our data for the preliminary. They looked at it. They got it. And then it was reversed again without giving us the question in the third supplemental. And as far as, you know, looking at the entire record, that the fact that we got a lot of questions was our own fault, this happens in all cases. In all cases, you file a questionnaire. You get 20, 30, 40, 50 questions and supplementals from the Commerce Department. You try your best. Sometimes you miss. Sometimes you don't do things exactly correctly. We missed on finishing the cost reconciliation chart. And instead of kind of giving us the template, instead of asking us in the third supplemental questionnaire, Commerce basically threw the book at us at the end of the day. And that total AFA at a punitive 78.17% rate is contrary to BMW and contrary to law. And the decision is not based on substantial evidence. Thank you very much. Thank you, counsel. The case is submitted.